ORAL ARGUMENT NOT YET SCHEDULED
No. 16-1061

# In the United States Court of Appeals
# for the District of Columbia Circuit

SUSQUEHANNA INTERNATIONAL GROUP, LLP,
KCG HOLDINGS, INC.,
BATS GLOBAL MARKETS, INC.,
MIAMI INTERNATIONAL SECURITIES EXCHANGE, LLC, AND
BOX OPTIONS EXCHANGE LLC

Petitioners,

v.

SECURITIES AND EXCHANGE COMMISSION,

Respondents,

-------------------------------------------------------------------

OPTIONS CLEARING CORPORATION,
Intervenor.

ON PETITION FOR REVIEW OF A FINAL ORDER
OF THE SECURITIES AND EXCHANGE COMMISSION

**FINAL BRIEF FOR PETITIONERS**
**SUSQUEHANNA INTERNATIONAL GROUP, LLP, ET AL.**

October 14, 2016

David H. Thompson
Howard C. Nielson, Jr.
Peter A. Patterson
Harold S. Reeves
COOPER & KIRK, PLLC
1523 New Hampshire Ave., N.W.
Washington, D.C.  20036
(202) 220-9600

*Counsel for Petitioners*

## TABLE OF CONTENTS

<u>Page</u>

CERTIFICATE OF PARTIES, RULINGS UNDER REVIEW,
AND RELATED CASES ................................................................................i

RULE 26.1 CORPORATE DISCLOSURE STATEMENT................................ iii

TABLE OF AUTHORITIES ...........................................................................vi

GLOSSARY....................................................................................................ix

JURISDICTIONAL STATEMENT ..................................................................1

STANDARD OF REVIEW ..............................................................................1

STATEMENT OF ISSUES PRESENTED FOR REVIEW ...................................2

STATUTES AND REGULATIONS..................................................................2

STATEMENT OF THE CASE...........................................................................3

I.      The Nature of the Case ..........................................................................3

II.     The Options Clearing Corporation .......................................................3

III.    The Clearing Process .............................................................................5

IV.     OCC's Plan .............................................................................................7

V.      The Regulatory Regime..........................................................................11

        A.      Commission Oversight of OCC ....................................................11

        B.      Applicable Exchange Act Provisions  ...........................................11

VI.     The Procedural Background ....................................................................12

SUMMARY OF ARGUMENT .........................................................................16

STANDING ....................................................................................................20

ARGUMENT ..................................................................................................21

I.      The Plan Formulated by OCC and Approved by the Commission
        Is Contrary to Law. ...............................................................................21

        A.      The Plan Unduly Burdens Competition in Violation of Sections
                17A(b)(3)(I) and 3(f) of the Exchange Act. ...............................22

B.    The Plan Harms Investors and the Public Interest in Violation of Section 17A(b)(3)(F) of the Exchange Act. ........................................33

C.    The Plan Allocates Unreasonable Clearing Fees in an Inequitable and Discriminatory Manner in Violation of Sections 17A(B)(3)(D) and 17A(B)(3)(F) of the Exchange Act. ....................................................41

D.    The Plan Was Formulated in Violation of OCC's Bylaws and Section 19(g)(1) of the Exchange Act. ...........................................................43

II.    OCC's Proposal Was Substantively and Procedurally Flawed. ...................48

A.    OCC Proposed a Substantively Unreasonable Plan. ...........................48

B.    OCC Violated Its Own Procedural Rules. ...........................................48

C.    OCC Failed to Engage in Reasoned Decisionmaking. .......................49

III.    The Commission's Decision to Approve the Plan Was Arbitrary, Capricious, and an Abuse of Discretion. .......................................................50

A.    The Commission Failed to Engage in Reasoned Decisionmaking. ....50

1.    The Commission Accepted Unreasonable Assurances that Were Unsupported by the Administrative Record. ...................51

2.    The Commission Misunderstood a Key Feature of the Plan. .................................................................................54

3.    The Commission Overlooked or Ignored Central Elements of the Plan and Key Facts. .......................................................54

B.    The Commission Failed to Consider Reasonable Alternatives. ..........55

C.    The Commission Failed to Address Significant Comments. ..............58

D.    The Commission's Refusal to Require OCC to Comply with Its Own Bylaws Was Arbitrary and Capricious. ...............................................59

CONCLUSION ...................................................................................................60

CERTIFICATE OF COMPLIANCE ...................................................................61

STATUTORY ADDENDUM ...............................................................................62

# TABLE OF AUTHORITIES

**Cases** **Page**

*American Radio Relay League, Inc. v. FCC*, 524 F.3d 227
 (D.C. Cir. 2008) ...................................................................49, 50

*\*Bradford Nat'l Clearing Corp. v. SEC*, 590 F.2d 1085 (1978) ............................23

*Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643 (1980)......................................26

*\*Chamber of Commerce v. SEC*, 412 F.3d 133 (D.C. Cir. 2005) .................2, 20, 56

*\*City of Holyoke Gas & Elec. Dept. v. FERC*, 954 F.2d 740
 (D.C. Cir. 1992) ...................................................................49, 53

*Connecticut Light & Power Co. v. NRC*, 673 F.2d 525 (D.C. Cir. 1982) ...............51

*FEC v. Rose*, 806 F.2d 1081 (D.C. Cir. 1986)..........................................................2

*Home Box Office, Inc. v. FCC*, 567 F.2d 9 (D.C. Cir. 1977)...............................2, 58

*\*Laclede Gas Co. v. FERC*, 873 F.2d 1494 (D.C. Cir. 1989) ..................................55

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877 (2007)..............25

*\*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
 463 U.S. 29 (1983)............................................................................1, 2

*\*NetCoalition v. SEC*, 615 F.3d 525, 539 (D.C. Cir. 2010) ....................................51

*\*Portland Cement Ass'n v. Ruckelshaus*, 486 F.2d 375
 (D.C. Cir. 1973) ...............................................................50, 51, 58

*Public Citizen v. Steed*, 733 F.2d 93 (D.C. Cir. 1984).............................................2

*Puerto Rico Mar. Shipping Auth. v. Federal Mar. Comm'n*,
 678 F.2d 327 (D.C. Cir. 1982)............................................................50

*SEC v. Chenery Corp.*, 332 U.S. 194 (1947)....................................................50, 51

*SEC v. Sloan*, 436 U.S. 103 (1978).........................................................................1

*\*Solite Corp. v. EPA*, 952 F.2d 473 (D.C. Cir. 1991) ............................................51

*Steenholdt v. FAA*, 314 F.3d 633 (D.C. Cir. 2003)................................................48

*United States Postal Serv. v. Postal Regulatory Comm'n*,
 785 F.3d 740 (D.C. Cir. 2015)............................................................50

## Statutes and Regulations

5 U.S.C. § 706(2)(A), (E) ..................................................................1

15 U.S.C.

    § 78c(a)(26)..........................................................................43

    § 78c(a)(27)..........................................................................43

    § 78c(f)......................................................................12, 17, 23

    § 78k-1................................................................................11

    § 78k-1(a)(1)(C)....................................................................23

    § 78q-1(a)(2) .......................................................................22

    § 78q-1(b)(3)(D) ..........................................................12, 18, 41

    § 78q-1(b)(3)(F)..............................................12, 18, 23, 33, 41

    § 78q-1(b)(3)(I).............................................................11, 17, 23

    § 78s(b)(1) ...........................................................................11

    § 78s(b)(2).......................................................................1, 11

    § 78s(b)(2)(C)(i) ....................................................................45

    § 78s(g)(1)..................................................................12, 19, 43, 45

    § 78y(a)(1) .............................................................................1

    § 78y(a)(4) .............................................................................1

Securities and Exchange Act, Release No. 34-46469, File No. SR-OCC-2002-02 (Sept. 6, 2002), 67 Fed. Reg. 58093 (Sept. 13, 2002) ..............................4, 47, 48

## Other

*BofA Merrill Lynch US High Yield Effective Yield*, FEDERAL RESERVE BANK OF ST. LOUIS (June 13, 2016), https://goo.gl/wHmDXS .........................................32

*BofA Merrill Lynch US Corporate AA Effective Yield*, FEDERAL RESERVE BANK OF ST. LOUIS, https://goo.gl/jvZJ0p ....................................................................32

*Clearing Services*, OCC, http://goo.gl/QVzvwa.........................................................6

FINANCIAL STABILITY OVERSIGHT COUNCIL, UNITES STATES DEPARTMENT OF THE TREASURY, APPENDIX A: DESIGNATION OF SYSTEMICALLY IMPORTANT FINANCIAL MARKET UTILITIES (2012), https://goo.gl/jPblRl ...............................6

Justin Grant, *Top Innovators: Dave Cummings*, ADVANCED TRADING,
    https://goo.gl/p1l0CX ............................................................................4

Letter from James E. Brown, General Counsel, The Options Clearing
    Corporation to Kevin O'Neill, Deputy Secretary, SEC
    (May 27, 2014), http://goo.gl/8k233c ................................................58

*OCC and Investor Protection*, CBOE, http://goo.gl/K4NHmo ...............................7

OCC Bylaws, *available at* http://goo.gl/EbDCd4 ....................................................44

*OCC Schedule of Fees / April 2014*, OCC, http://goo.gl/JMcyMn .........................40

*OCC Schedule of Fees / March 2016*, OCC, http://goo.gl/rlwraF .........................40

*OCC Schedule of Fees / May 2016*, OCC, http://goo.gl/YR3hQa .........................40

*OCC Schedule of Fees / January 2013*, OCC, http://goo.gl/kfZQyu .....................40

OCC, GOOD NEWS AND NEW OPPORTUNITIES: 2009 ANNUAL REPORT,
    http://goo.gl/aEmQLn ........................................................................29

OCC, PREPARING FOR TOMORROW: 2015 ANNUAL REPORT,
    http://goo.gl/2qyQOl ........................................................................6, 7

OCC, STATEMENTS FROM A FORWARD-LOOKING COMPANY: 2010 ANNUAL
    REPORT, http://goo.gl/Nyc5BL ...........................................................7

Press Release: OCC Announces Its Designation as a Systemically Important
    Financial Market Utility (July 19, 2012), http://goo.gl/JPQf5z .........................7

Tom Polansek, *Options Clearing Corp raises fees, cites regulatory scrutiny*,
    REUTERS (Apr. 2, 2014), http://goo.gl/fVvIKm .................................................39

## JURISDICTIONAL STATEMENT

This is a petition for review of the Securities Exchange Commission's ("the Commission" or "SEC") Order Setting Aside Action by Delegated Authority, Approving Proposed Rule Change Concerning the Options Clearing Corporation's Capital Plan and Denying Motions, Release No. 34-77112, File No. SR-OCC-2015-02 (Feb. 11, 2016) ("Approval Order"). The Commission issued the Approval Order pursuant to Section 19(b)(2) of the Exchange Act, 15 U.S.C. § 78s(b)(2). This Court has jurisdiction under Section 19y(a)(1) of the Exchange Act, 15 U.S.C. § 78y(a)(1).

## STANDARD OF REVIEW

Under the Administrative Procedure Act, this Court must set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "unsupported by substantial evidence." 5 U.S.C. § 706(2)(A), (E); 15 U.S.C. § 78y(a)(4). Agency decisions that violate federal statutes must of course be set aside as not in accordance with law. *SEC v. Sloan*, 436 U.S. 103, 116-19 (1978). Although the "scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency," the Court must nonetheless ensure that the Commission "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29,

43 (1983) (quotation marks omitted); *Chamber of Commerce v. SEC*, 412 F.3d 133, 140 (D.C. Cir. 2005). The Commission must also offer a reasoned explanation for its action, *FEC v. Rose*, 806 F.2d 1081, 1088 (D.C. Cir. 1986), afford adequate consideration to every reasonable alternative presented for its consideration, *Public Citizen v. Steed*, 733 F.2d 93, 103-04 (D.C. Cir. 1984), and respond to all "relevant" and "significant" public comments, *Home Box Office, Inc. v. FCC*, 567 F.2d 9, 35 n.58 (D.C. Cir. 1977).

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.     Whether the Plan proposed by OCC and approved by the Commission violated the Exchange Act.

2.     Whether the Plan should be set aside as arbitrary, capricious, or an abuse of discretion.

3.     Whether the Approval Order should be set aside as arbitrary, capricious, or an abuse of discretion.

## STATUTES AND REGULATIONS

The pertinent statutes are provided in the statutory appendix.

## STATEMENT OF THE CASE

### I.    The Nature of the Case

This petition challenges five national securities exchanges' attempt to unjustly and illegally leverage their equity ownership of the Options Clearing Corporation ("OCC") to gain a competitive advantage over newer exchanges that were formed after OCC ceased permitting new exchanges to acquire equity interests in 2002. Under the guise of raising additional capital for OCC, the five equity owners transformed OCC from a public utility that refunded all unused fees to its customers into a for-profit monopoly that pays princely dividends to its shareholders. OCC failed even to notify the non-shareholder exchanges that it was considering this plan, let alone to provide them an opportunity to present their views or offer alternative proposals. OCC thus violated requirements of its own bylaws that it had adopted, with the encouragement of the SEC, to reduce the risk that the shareholder exchanges would use their control of OCC's Board to pursue anticompetitive measures like the plan challenged here.

### II.    The Options Clearing Corporation

OCC is a Delaware corporation owned by NYSE ARCA; NYSE MKT; the Chicago Board Options Exchange, Inc.; the International Securities Exchange, LLC; and NASDAQ OMX PHLX. In 2002, the bylaws of OCC were amended to

prohibit any additional exchanges from becoming shareholders, even if they became "members" of OCC and began to use its services in the future.[1]

OCC provides clearing services (explained below) for options transactions that take place on each of the five shareholder exchanges and on any other exchanges that are members, but not shareholders, of OCC. There are currently nine such non-shareholder exchanges. Petitioners Miami International Securities Exchange, LLC and BOX Options Exchange LLC are non-shareholder exchanges, while Petitioner Bats Global Markets, Inc., owns and operates two non-shareholder exchanges.

The non-shareholder member exchanges are new entrants into the marketplace for equities and options exchanges. Petitioner Bats Global Markets, for example, was founded in 2005 after NYSE and NASDAQ each merged with a principal competitor in a single week, steps widely seen as "eliminat[ing] competition so [NYSE and NASDAQ] could raise prices."[2] Bats Global Markets was founded to provide an alternative to this emerging duopoly.[3]

OCC also has approximately 120 clearing members. The clearing members are financial intermediaries that clear and settle options trades on behalf of

---

[1] Securities and Exchange Act, Release No. 34-46469, File No. SR-OCC-2002-02 (Sept. 6, 2002), 67 Fed. Reg. 58093, 58095 (Sept. 13, 2002).

[2] Justin Grant, *Top Innovators: Dave Cummings*, ADVANCED TRADING, https://goo.gl/p1l0CX.

[3] *Id.*

4

institutional customers like pension funds, mutual funds, asset managers, and insurers, and of broker-dealers, who execute trades for themselves or for retail investors. The clearing members collect fees from their customers, pay clearing fees to OCC, and receive any refunds paid by OCC. These refunds are either passed on to customers directly or are reflected in lower fees and tighter market quotes; either way, they reduce costs for investors. KCG Americas LLC, a subsidiary of Petitioner KCG Holdings, is a clearing member.

The pension funds, mutual funds, asset managers, insurers, broker-dealers, and retail investors who trade exchange-listed options using OCC's clearing members' services are often referred to as OCC's "market participants." Petitioner Susquehanna International Group, LLP, through its affiliated entities, is a market participant.

## III.   The Clearing Process

Once two brokers have agreed to an options transaction on behalf of a buyer and a seller, a clearing agency ensures that the trade is completed. To accomplish this, a traditional clearing agency first "compares" the submissions of the seller's broker with those of the buyer's to confirm that both parties have agreed to the same terms. Second, the "compared trade" is "matched." This involves notifying the selling and buying brokers of their respective obligations. Finally, the "matched trade" is settled.

5

OCC is the sole central clearing house for stock options and equity index options that are listed on U.S. exchanges. Doc. 60 at 1, JA675.[4] OCC also clears transactions involving over-the-counter options—options negotiated directly between broker-dealers that are not listed on an exchange.

When OCC accepts a trade for clearing, it becomes a central counterparty to the transaction—becoming the buyer for every seller and the seller for every buyer; thus insulating the clearing members and their customers from counterparty risk.[5] OCC thus faces significant credit risk from the transactions it clears. In addition to adopting strict membership standards, OCC protects against credit risk in two ways. First, it requires that clearing members make margin deposits representing a percentage of the notional value of the options contracts they buy or sell. At the end of 2015, these deposits amounted to $98.3 billion.[6] Second, OCC requires that

---

[4] Items in the List of the Contents of the Administrative Record are cited by docket number, original document page number, and page number in the Joint Appendix as "Doc.__ at__, JA__."

[5] *Clearing Services*, OCC (last visited June 13, 2016), http://goo.gl/QVzvwa; FINANCIAL STABILITY OVERSIGHT COUNCIL, UNITES STATES DEPARTMENT OF THE TREASURY, APPENDIX A: DESIGNATION OF SYSTEMICALLY IMPORTANT FINANCIAL MARKET UTILITIES 183 (2012), https://goo.gl/jPblRl.

[6] OCC, PREPARING FOR TOMORROW: 2015 ANNUAL REPORT 19, http://goo.gl/2qyQOl ("PREPARING FOR TOMORROW").

each clearing member contribute to a clearing fund in proportion to that member's level of market activity.[7] The clearing fund held $12.1 billion at the end of 2015.[8]

## IV.   OCC's Plan

On July 18, 2012, OCC was designated as a "systemically important financial market utility" pursuant to the Dodd-Frank financial overhaul law.[9] OCC subsequently proposed amending its rules to implement a plan (the "Capital Plan" or the "Plan") that would increase its shareholders' equity by 988%. Although OCC (i) has never needed to access its shareholders' equity to meet its expenses, (ii) generated profits and paid a refund of $64.6 million even during the financial crisis of 2008,[10] and (iii) enjoys a AA+ credit rating, OCC proposed increasing its equity from $25 million to $247 million. This $247 million buffer was not intended to protect against counterparty risk, on-balance sheet credit risk, or market risk. Doc. 60 at 25, JA698. Those risks are covered by the $110 billion reserves in OCC's margin and clearance funds.[11] It was instead intended to protect against unexpected administrative expenses by providing OCC an amount sufficient to

---

[7] *OCC and Investor Protection*, CBOE (last visited June 13, 2016), http://goo.gl/K4NHmo.

[8] PREPARING FOR TOMORROW at 19, *supra* note 6.

[9] Press Release: OCC Announces Its Designation as a Systemically Important Financial Market Utility (July 19, 2012), http://goo.gl/JPQf5z.

[10] OCC, STATEMENTS FROM A FORWARD-LOOKING COMPANY: 2010 ANNUAL REPORT 34, http://goo.gl/Nyc5BL.

[11] PREPARING FOR TOMORROW at 19, *supra* note 6.

7

cover *all* of its operating expenses for six months ($117 million), *with $130 million to spare*. Doc. 60 at 9 n.35, JA682.

Since its inception, OCC has met its operating costs by charging a fixed fee to clearing members on each transaction that it clears. At the end of each year, OCC refunded to its clearing members the entire amount by which the fees it had collected exceeded its expenses. The fees paid by each clearing member were based on the volume of its use of OCC's clearing services, and each member's refund was based upon the amount of fees it had paid. Neither the shareholder exchanges nor the non-shareholder exchanges paid fees or collected refunds. The net effect of this system was that OCC functioned as a public utility; each clearing member bore a share of OCC's actual expenses proportional to its use of OCC's services. Although purportedly designed to protect OCC against unexpected administrative expenses, the Plan transforms OCC to a for-profit monopoly, paying as dividends to the shareholder exchanges a large portion of the excess fees that would have been refunded to clearing members and investors under OCC's historical business model.

To appreciate the significance of this transformation, it is important to understand OCC's historical development. OCC began as the Chicago Board Options Exchange's clearing facility when options began trading on that exchange in 1973. When the American Stock Exchange and the Philadelphia Stock

8

Exchange became options exchanges a few years later, the SEC allowed them to decide whether they wanted multiple clearing agents or one central clearing agent. At the time, the exchanges were non-profit and member-driven. The members of the respective markets, with the SEC's approval, decided to rely on OCC as the only central clearing agent for listed options. All parties understood that they were creating a monopoly, but they accepted this outcome on the understanding that OCC would operate for the benefit of members and the public as a low-cost utility.

The Plan seeks to raise a "Target Capital Requirement," comprising a "Baseline Capital Requirement" plus a "Target Capital Buffer." Doc. 60 at 9, JA682. The Baseline Capital Requirement equals "the greatest of: (i) six months budgeted operating expenses for the following year; (ii) the maximum cost of the recovery scenario from OCC's recovery and wind-down plan; or (iii) the cost to OCC of winding down operations as set forth in its recovery and wind-down plan." *Id.* OCC set this amount at $117 million for 2015. *Id.* The Target Capital Buffer, which OCC set at $130 million, provides an additional cushion against unanticipated administrative expenses. *Id.* at 9 n.35, JA682.

Because OCC's existing capitalization was $25 million, the Plan required OCC to raise an additional $222 million. OCC proposed doing so by retaining $72 million in clearing fees that would otherwise have been refunded at the end of 2014 and by having the five shareholder exchanges each contribute $30 million.

9

Doc. 22 at 8, JA146. Should OCC's capital fall below certain thresholds, the

shareholder exchanges committed to provide additional "Replenishment Capital,"

up to the amount of the baseline capital requirement (currently $117 million)

subject to a $200 million cap. Doc. 60 at 10 n.37, 11, JA683, JA684.

Under the Plan, the fees charged to clearing members are computed by

projecting OCC's expenses for the coming year, adding what OCC describes as a

"25%" buffer to that figure, and then dividing the total by the number of options

transactions projected to be cleared in the coming year. Doc. 60 at 13, JA686.

Because the buffer is calculated by dividing projected expenses by .75, it actually

amounts to 33% of projected expenses—*i.e.*, projected expenses of $100 million

would result in a buffer of $33 million. *Id*.

Under the Plan, clearing members will receive at most *half* of the excess fees

that were *all* refunded to them under OCC's traditional public utility model. The

first cut from excess fees will be used, if necessary, to maintain OCC's Baseline

Capital Requirement and Target Capital Buffer. Half of any remaining excess fees

will be used to pay dividends to the shareholder exchanges, and the remainder will

be returned to the clearing members. *Id.* at 14-16, JA687-89.

If the shareholder exchanges are required to contribute Replenishment

Capital, moreover, OCC will suspend refunds and dividends until it has repaid the

Replenishment Capital in full and restored the Target Capital Requirement. If OCC

fails to do so for more than twenty-four months, *refunds* will be discontinued permanently, though *dividends* will resume once the Replenishment Capital has been repaid and the Target Capital Requirement restored. Doc. 22 at 15, JA153. 100% of fees not needed to pay operating expenses and maintain capital targets would then be used to pay the renewed dividends.

## V.   The Regulatory Regime

### A.   Commission Oversight of OCC

OCC is registered as a clearing agency under Section 17A of the Exchange Act, 15 U.S.C. § 78q-1. As such, OCC is a securities industry "self-regulatory organization," subject to comprehensive SEC oversight. Among other things, the Commission must approve any rules or rule changes proposed by OCC, such as the Plan and the numerous changes to OCC's policies and governing documents it entails. Exchange Act § 19(b)(1), (2); 15 U.S.C. § 78s(b)(1), (2). The Commission may do so only if the proposed changes comply with the Exchange Act. *Id.*

### B.   Applicable Exchange Act Provisions

The Commission was required to determine whether the Plan complied with the following provisions of the Exchange Act:

- Section 17A(b)(3)(I) of the Exchange Act, which requires that clearing agency rules "not impose any burden on competition not necessary or appropriate in furtherance of the purposes of this chapter." 15 U.S.C. § 78q-1(b)(3)(I).

11

- Section 3(f) of the Exchange Act, which required the Commission "to consider or determine" whether a rule change proposed by a self-regulatory organization (such as OCC) "will promote efficiency, competition, and capital formation." 15 U.S.C. § 78c(f).

- Section 17A(b)(3)(F) of the Exchange Act, which requires that clearing agency rules be "designed . . . to protect investors and the public interest" and prohibits rules "designed to permit unfair discrimination . . . among participants in the use of the clearing agency." 15 U.S.C. § 78q-1(b)(3)(F).

- Section 17A(b)(3)(D) of the Exchange Act, which requires that clearing house rules "provide for the equitable allocation of reasonable dues, fees, and other charges among its participants." 15 U.S.C. § 78q-1(b)(3)(D).

- Section 19(g)(1) of the Exchange Act, which requires that "[e]very self-regulatory organization shall comply with . . . its own rules." 15 U.S.C. § 78s(g)(1).

These provisions are set forth in full in the statutory addendum.

## VI.   The Procedural Background

OCC filed its proposed rule change implementing the Plan on January 14, 2015. Doc. 1. The Commission published notice of this filing in the Federal Register on January 26, 2015. Doc. 2.

The Commission received seventeen comment letters. Docs. 3-19, JA043-138. Apart from OCC, all commenters—including non-shareholder exchanges; clearing members; market participants; market makers; and an association representing hundreds of broker-dealers, banks and asset managers—opposed the plan.

The commenters expressed concern that the Plan would transform OCC from a public utility into a for-profit monopoly, giving the shareholder exchanges an anticompetitive subsidy, provided by their competitors, that "presents an opportunity for predatory pricing." Doc. 4 at 2, JA049. *See also* Doc. 15 at 2, JA122. Commenters also objected that the Plan would provide the shareholder exchanges with an excessive rate of return on their investment in a company with a AA+ S&P rating, Doc. 14 at 1, JA119; Doc. 6 at 3, JA069, and would create a powerful incentive for OCC to raise clearing fees to increase its shareholders' dividends, Doc. 14 at 2, JA120. Commenters argued that OCC's justification for the Plan lacked evidentiary support and was rife with errors in reasoning, logic, and even basic math. *See, e.g.*, Doc. 5 at 7-8, 10-11; JA059-60, 062-63.

The commenters complained that OCC's new, for-profit model would reduce by half or more the refunds traditionally paid to clearing members and, in turn, investors. *See, e.g.*, Doc. 6 at 2-3, JA068-69. Commenters also voiced concern that the Plan would use excess 2014 fees, as well as a portion of excess annual fees going forward, to achieve and maintain OCC's new capital targets rather than to pay refunds (or dividends). Although the Plan would effectively treat these excess fees as capital contributions, it would not provide any benefits to the clearing members or investors who paid these fees comparable to the generous compensation granted the shareholder exchanges. *Id.* at 3, JA69.

Finally, the commenters objected that OCC had failed not only to consider alternatives that would not harm competition, but also to provide non-shareholder exchanges with notice and an opportunity to participate in OCC's decisionmaking process as required by OCC's own bylaws. Indeed, the non-shareholder exchanges were "unaware of the Proposal until it was filed with the SEC." Doc. 14 at 2, JA120.

Exercising delegated authority, the SEC's Division of Trading and Markets disregarded these objections and approved the proposed Plan on March 6, 2015. Doc. 22, JA139-85. Petitioners then sought review before the full Commission. *See* Docs. 28-32, JA186-297.

The Commission granted the Petitions for Review on September 10, 2015, *see* Doc. 40, and issued a final order approving the Plan on February 11, 2016, *see* Doc. 60. The Commission held that the Plan was consistent with Section 17A(b)(3)(F) because it was "designed to enhance OCC's capitalization rather than to enable the Stockholder Exchanges to monetize OCC's clearing monopoly" and did not "change[ ] OCC's essential role as a market utility." Doc. 60 at 28, JA701. In support of this conclusion, the Commission accepted OCC's representation that the dividends constituted "reasonable" compensation for the "cost and risks associated with the Stockholder Exchanges' contributed and committed capital," *Id*. at 29, JA702, and observed that "[u]nder the Refund Policy, OCC will continue its practice of refunding a significant percentage of excess clearing fees to clearing

14

members, thus preserving that aspect of OCC's industry 'utility' function." *Id*. at 28-29, JA701-02. The Commission also indicated that it did "not believe that the Capital Plan operates to increase fees, inflate operating expenses or drive up transaction costs in a manner inconsistent with the protection of investors or the public interest," *id*. at 29, JA702, and "[a]t the very least, [it did] not believe that it is inevitable that the Capital Plan will lead to higher fees," *id*. at 30, JA703.

The Commission held that the Plan would not impose any burden on competition that was not "necessary or appropriate" in violation of Section 17A(b)(3)(I) because it did not "as a whole, create[ ] a subsidy that unfairly advantages Stockholder Exchanges." *Id.* at 31, JA704. The Commission believed the Plan's disparate treatment of the shareholder and non-shareholder exchanges was necessary to promote "the significant interest under the Exchange Act in having a well-capitalized OCC to allow prompt clearance and settlement," *id.* at 32, JA705, and that "any potential dividends declared under the Dividend Policy are intended to be consideration for" the shareholder exchanges' "contribution or commitment to capital and compensation for their opportunity cost and risk of loss associated with such contribution and commitment," *id*. at 31, JA704. The Commission elsewhere asserted in passing that its conclusion that the Plan did not impose any unnecessary or inappropriate burdens on competition satisfied not only

15

Section 17A(b)(3)(I), but also Section 3(f)'s separate requirement that the Plan affirmatively "promote" competition. *See id*. at 40, JA713.

The Commission held that the Plan "provide[d] for the equitable allocation of reasonable dues, fees, and other charges among its participants," *id.* at 37, JA710, as required by Section 17A(b)(3)(D), because it did "not change the way that the fees are allocated among clearing members," and because "fees for similarly-situated market participants are equitable," *id*. at 36, JA709. The funds allocated away from refunds to pay for dividends were simply "compensation for the financial risks and obligations incurred by the Stockholder Exchanges . . . ." *Id.* The fees charged would be set at a reasonable level, moreover, and should give "participants the benefit of lower upfront transaction costs." *Id.*

Finally, the Commission dismissed concerns that OCC had violated Section 19(g)(1) of the Exchange Act by failing to follow its own bylaws on the ground that "OCC represented that it [had followed its bylaws] here," *id.* at 45, JA718, concluding also that "[s]uch questions are not appropriately addressed by the Commission in the context of reviewing this rule filing," *id.* at 46, JA719.

Petitioners seek review of the Approval Order.

## SUMMARY OF ARGUMENT

I.     The Plan violates the Exchange Act.

16

A.    The Plan places a significant and unwarranted burden on competition in violation Sections 17(A)(b)(3)(I) and 3(f) of the Exchange Act, 15 U.S.C. §§ 78c(f), 78q-1(b)(3)(I). The Plan sets clearing fees at a level designed to meet OCC's administrative costs and to produce a surplus amounting to 33% of those costs. While all of that surplus would have been refunded to the clearing members and investors who had paid the fees under OCC's traditional public utility business model, as much as half of the surplus will now be used to pay dividends to OCC's five shareholder exchanges—but not to the other member exchanges that OCC has barred from becoming shareholders. The shareholder exchanges will thus profit from *all* of OCC's clearing activity—including that which takes place on the non-shareholder exchanges with whom they compete— while the non-shareholder exchanges will not profit from *any* of it.

The Commission justified this anticompetitive subsidy as reasonable compensation for the shareholders' capital commitments. The non-shareholder exchanges were never offered an opportunity to contribute capital, however, and OCC disregarded other alternatives for raising capital that would not have harmed competition. In all events, OCC did not need hundreds of millions of dollars to shield against unexpected administrative costs, and the dividends provide the shareholder exchanges an exorbitant rate of return on their investment.

17

B.     The Plan harms the interests of investors and the public in violation of Section 17A(b)(3)(F) of the Exchange Act, 15 U.S.C. § 78q-1(b)(3)(F). In addition to thwarting competition, the Plan sacrifices the interests of investors and the public by transforming OCC from a public utility to a for-profit monopoly. Instead of refunding excess clearing fees to its customers, OCC will now use up to half of those fees to pay dividends to its shareholders. In addition, the Plan requires OCC's customers to contribute to its capital targets through retained fees, but it treats their contributions and refund rights much less favorably than the capital contributions and dividend rights of the shareholder exchanges. The Plan also raises the real cost of OCC's services, net of refunds, by 16.67%, and it creates incentives for OCC to raise fees even further. Indeed, OCC has already raised its fees considerably across the board—fees for some transactions are now more than twice what they were before OCC began formulating the Plan. These fee increases are of course ultimately borne by the investing public.

C.     The Plan inequitably allocates fees and unfairly discriminates among OCC's participants in violation of Sections 17A(b)(3)(D) and 17A(b)(3)(F) of the Exchange Act, 15 U.S.C. §§ 78q-1(b)(3)(D), 78q-1(b)(3)(F). The Plan's disparate treatment of the shareholder and non-shareholder exchanges violate these statutory provisions, as does its inequitable treatment of the capital contributions

18

and the interests in OCC's excess fees of the shareholder exchanges, on the one hand, and those of the clearing members and investors, on the other hand.

       D.    The Plan was adopted in violation of OCC's own bylaws, and thus in violation of Section 19(g)(1) of the Exchange Act, 15 U.S.C. § 78s(g)(1). Despite the obvious effect the Plan might have on competition, OCC ignored provisions of its bylaws requiring it to afford the non-shareholder exchanges notice of its deliberations and an opportunity to be heard. The Plan presents a textbook example of the type of anticompetitive action these bylaws were intended to prevent.

       II.    OCC's proposal was substantively and procedurally flawed. As an initial matter, the Plan is substantively unreasonable, for the same reasons it violates the Exchange Act. In addition, OCC violated its own procedural rules when it crafted the Plan by failing to provide its non-shareholder member exchanges with notice and an opportunity to be heard. OCC also failed to disclose the studies or data upon which it purported to rely to its members, to the public, or even to the Commission. This failure denied the members and the public of their opportunity to contribute to OCC's decisionmaking process and hindered their ability to protect their interests before the Commission. It also prevented the Commission from conducting the meaningful review required by the APA.

III.    The Commission's decision approving the Plan was arbitrary,

capricious, and an abuse of discretion. Rather than require that OCC provide the

analysis and data upon which it relied or meaningfully scrutinize OCC's

arguments, the Commission simply accepted OCC's conclusions and

representations at face value. The Commission also misunderstood or overlooked

various arbitrary and unlawful components of the Plan, failed to consider

reasonable alternatives presented by the commenters, and failed to address relevant

and significant comments. Finally, the Commission acted arbitrarily and

capriciously by refusing to require OCC to comply with its own bylaws.

## STANDING

Petitioners have standing under the APA and Article III because the Plan

approved by the Commission inflicts concrete injuries on those Petitioners that

would be redressed by relief from this Court. *Chamber of Commerce v. SEC*, 412

F.3d 133, 138 (D.C. Cir. 2005). Petitioners BOX Options Exchange, Miami

International Securities Exchange, and Bats Global Markets are harmed by the

anticompetitive subsidy the Plan affords their competitors and by the

Commission's refusal to require OCC to comply with procedural safeguards

specifically adopted to protect Petitioners' interests. *See infra* at I.A & I.D.

Petitioners Susquehanna and KCG Holdings are harmed by increased clearing fees

and reduced refunds resulting from the Plan, and by diminished competition in the

20

exchange marketplace. *See infra* at I.B & I.C. These injuries would all be redressed if the petition for review were granted and Approval Order vacated.

As options exchanges, a clearing member of OCC, and a market participant whose options trades are cleared by OCC, Petitioners are well within the zone of interests protected by the statutes invoked here, including provisions of the Exchange Act requiring that OCC's rules not unduly burden competition, protect investors and the public, equitably allocate reasonable fees, and avoid unfair discrimination.

## ARGUMENT

### I.      The Plan Formulated by OCC and Approved by the Commission Is Contrary to Law.

For forty years, OCC operated as a public utility, issuing to the clearing members and investors who used its services annual refunds of excess fees not needed to pay OCC's operating expenses. Before the Plan, OCC protected itself against unexpected administrative expenses by setting clearing fees to exceed expected operating expenses by an average of 31% and by maintaining shareholder equity of $25 million. These buffers served OCC well, and even during the depths of the 2008 financial crisis OCC always had more than enough capital to pay its administrative expenses. The Plan, which purportedly seeks to further protect OCC against unexpected administrative expenses, transforms OCC into a profit-making monopoly that uses up to half of its excess fees each year not to issue refunds, but

instead to pay dividends to the five shareholder exchanges, providing those exchanges with an extraordinary annual rate of return that may exceed 25%. The Plan not only provides the shareholder exchanges with an unfair advantage over the non-shareholder exchanges—with whom they compete and who are not permitted to become shareholders—but also sacrifices the interests of the clearing members and the investing public to the interests of the five shareholder exchanges.

The Plan violates the Exchange Act by improperly burdening competition, harming investors and the public interest, and inequitably allocating the fees generated by OCC. In addition, the Plan was formulated in blatant violation of the bylaws with which the Exchange Act requires OCC to comply. For all of these reasons, OCC and the Commission acted contrary to law in proposing and approving the Plan, and their actions must be set aside.

## A.  The Plan Unduly Burdens Competition in Violation of Sections 17A(b)(3)(I) and 3(f) of the Exchange Act.

In authorizing the Commission "to facilitate the establishment of a national system for the prompt and accurate clearance and settlement of transactions in securities," Congress directed the Commission to exercise "due regard for the public interest, the protection of investors, the safeguarding of securities and funds, *and maintenance of fair competition among brokers and dealers, clearing agencies, and transfer agents*." 15 U.S.C. § 78q-1(a)(2) (emphasis added); *see also*

*Bradford Nat'l Clearing Corp. v. SEC*, 590 F.2d 1085, 1091-92 (1978). Congress has made clear that "[i]t is in the public interest and appropriate for the protection of investors and the maintenance of fair and orderly markets to assure . . . fair competition . . . among exchange markets, and between exchange markets and markets other than exchange markets." 15 U.S.C. § 78k-1(a)(1)(C).

Consistent with Congress's policy in favor of fair competition, Section 17A(b)(3)(I) of the Exchange Act mandates that clearinghouse rules "not impose any burden on competition not necessary or appropriate in furtherance of the purposes of this chapter." 15 U.S.C. § 78q-1(b)(3)(I). In addition, where, as here,[12] the Commission "is required to . . . determine whether an action is necessary or appropriate in the public interest," Section 3(f) of the Exchange Act mandates that "the Commission shall also consider, in addition to the protection of investors, whether the action will *promote* efficiency, competition, and capital formation." 15 U.S.C. § 78c(f) (emphasis added). In proposing and approving the Plan, OCC and the Commission violated these statutory requirements.

The shareholder and non-shareholder exchanges compete to host option trades, operating "in an extremely competitive environment," in which "each exchange is always searching for a competitive edge over its competitors." Doc. 15 at 2, JA122. The non-shareholder exchanges compete with the five shareholder

---

[12] *See* 15 U.S.C. § 78q-1(b)(3)(F).

23

exchanges not only on price, but also by providing better technology, superior execution, greater efficiency, and heightened transparency.

The Plan imposes a significant and unwarranted burden on competition by requiring that as much as half of excess clearing fees resulting from options trades executed on *any* of OCC's member exchanges will be used to pay dividends to the shareholder exchanges—but not to OCC's non-shareholder member exchanges. Accordingly, the shareholder exchanges will now profit from *all* of the clearing activity of OCC, while the non-shareholder exchanges will not profit from *any* of it. Indeed, a portion of the clearing fees paid by market participants who choose to execute trades on non-shareholder exchanges will be paid to the very exchanges they chose not to patronize. As a result, the more options trades the *non-shareholder exchanges* handle, the larger the dividend that will be paid to the *shareholder exchanges*. The Plan thus results in the shareholder exchanges receiving a subsidy that insulates them from competition, paid for by all who trade options regardless of which exchange they choose in an amount set without regard for the share of the market those shareholder exchanges enjoy.

The shareholder exchanges may well "use the dividends to allow their members to trade at reduced fees," Doc. 9 at 2, JA100, and thus engage in predatory pricing in an attempt to regain market share and thwart the adoption of the new technology and transparency that has threatened their dominance, Doc. 4

at 2, JA049. But even were the shareholder exchanges not to use their windfall to lower fees, the result would still be anti-competitive because the monopoly profits generated under the Plan are distributed to OCC's shareholder exchanges to the exclusion of non-shareholder exchanges. "[U]nlawful price fixing, designed solely to obtain monopoly profits, is an ever-present temptation," *Leegin Creative Leather Prods., Inc. v. PSKS, Inc*., 551 U.S. 877, 892 (2007), to which OCC and the shareholder exchanges that control it have here succumbed.

In violation of Section 3(f) of the Exchange Act, the Commission failed even to consider whether the Plan will "promote" competition—let alone determine that it would do so. Nor would such a finding have been possible. The Commission appears to have believed that its conclusion that the Plan did not impose burdens on competition that were "not necessary or appropriate" under Section 17A(b)(3)(I) also sufficed to satisfy Section 3(f). Doc. 60 at 40, JA713. But even if the Commission's conclusion regarding Section 17A(b)(3)(I) were correct—and, as demonstrated below, it was not—the mere fact that a plan does not unnecessarily or inappropriately *burden* competition hardly entails that it affirmatively *promotes* competition. *Cf.* Doc. 60 at 31, JA704 (concluding that Section 17A(b)(3)(I) "does not require the Commission to make a finding that OCC chose the option that imposes the least possible burden on competition"); *id*. at 33, JA706 (concluding that "even if [the Plan] impose[s] a burden on

25

competition, that burden is necessary or appropriate in furtherance of the purposes of the Act"). Monopoly fees *never* promote competition. Indeed, horizontal price-fixing arrangements are the "archetypal example" of practices so "plainly anticompetitive" that they amount to a *per se* violation of the antitrust laws. *Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 646-47 (1980). The Commission thus failed to perform its duty under Section 3(f).

In all events, the burden on competition imposed by the Plan was not "necessary or appropriate in furtherance of the purposes of" the Exchange Act as required by Section 17A(b)(3)(I). In concluding otherwise, the Commission reasoned that the disparate treatment of the shareholder and non-shareholder exchanges was necessary to promote "the significant interest under the Exchange Act in having a well-capitalized OCC to allow prompt clearance and settlement," Doc. 60 at 32, JA705, and that "any potential dividends declared under the Dividend Policy are intended to be consideration for" the shareholder exchanges' "contribution or commitment to capital and compensation for their opportunity cost and risk of loss associated with such contribution and commitment," *id*. at 31, JA704.[13]

---

[13] "[I]n evaluating the relative competitive effects of the Capital Plan and alternative sources of capital," the Commission also stated "that it does not believe that the Capital Plan will necessarily lead to increased fees or transaction costs." Doc. 60 at 34, JA707. Although Petitioners respectfully submit that the

To be sure, unlike the shareholder exchanges, the non-shareholder exchanges "are not obligated"—nor, indeed, permitted—"to provide a Capital Contribution or commit to provide Replenishment Capital." *Id.* at 31 n.113, JA704. But this only underscores the Plan's anticompetitive nature, as only shareholder exchanges are given the opportunity to invest in the OCC under the Plan. Allowing the non-shareholder exchanges to participate on equal terms with the shareholder exchanges in providing OCC with the immediate investments and capital commitments it desired would have achieved any of OCC's legitimate purposes just as well as the Plan, and it would have done so without conferring a competitive advantage on any exchange or group of exchanges. The only rationale even hinted at by the Commission for not raising capital from the non-shareholder exchanges was that it "would have necessitated governance changes over a period of time." *Id.* at 40, JA713. This rationale cannot be taken seriously, however, since the Plan itself required significant corporate governance changes.[14]

Nor was turning to the non-shareholder exchanges the only available alternative. Most obviously, OCC could have met its capital target by retaining

---

Commission's belief is erroneous—*see infra* at I.B—whether or not the Plan would necessarily lead to increased clearing fees is irrelevant to whether it burdens competition between exchanges.

[14] The Plan required OCC to change its "policies on fees, refunds, and dividends," to "amend[ ] its By- Laws," to "amend[ ] its Restated Certificate of Incorporation," and to "amend[ ] its Stockholders Agreement." Doc. 60 at 8 n.33, JA 681; *see also* Doc. 22 at 18-25, JA156-63 (describing these changes at length).

excess fees. Doc. 5 at 6-7, JA058-59; Doc. 6 at 4, JA070. Indeed, the Plan raised nearly one third of the desired capital by retaining excess fees from 2014 alone. And it subsequently refunded $161 million in excess fees collected in 2015. The excess fees available in 2014 and 2015 alone belie any suggestion that this alternative could not have raised capital fast enough. In all events, any suggestion that time was of the essence is difficult to take seriously, for nothing in the record suggests that OCC faced, for the first time in its history, a need to tap into its pre-existing and rapidly increasing capital reserves to meet operating expenses—let alone an imminent need to do so. As other alternatives, OCC could have issued a new class of common stock or preferred securities and sold them to clearing members, to the exchanges, or to the general public. Doc. 60 at 26-27, JA699-700.

Given these alternatives that would have had no negative effect on competition, the burden on competition imposed by the Plan cannot possibly be justified as "necessary or appropriate in furtherance of the purposes of" the Exchange Act.

Furthermore, although the Commission invoked "the significant interest under the Exchange Act in having a well-capitalized OCC," *id.* at 32, JA705, it failed even to consider whether there was any need for OCC to raise additional capital solely to provide even greater protection against unexpected administrative expenses, let alone a need sufficient to justify burdening competition. No

28

explanation was offered for why OCC would be unable to meet its administrative

expenses in even the most severe financial crisis through the protection already

built in by its practices of setting fees at a comfortable margin above projected

expenses and, if necessary, by tapping into OCC's existing equity. Even during the

height of the financial crisis, clearing fees not only covered OCC's operating

expenses but also generated annual refunds exceeding $57 million between 2007

and 2009.[15] The Commission never explained why it nevertheless was necessary to

add hundreds of millions of dollars to OCC's balance sheet at the expense of

competition.

　　　And even if that capital was, in fact, needed and no alternatives less harmful

to competition were available, the Commission's conclusion that paying half of

OCC's excess fees to the shareholder exchanges as dividends could be justified as

"consideration for [their] contribution or commitment to capital and compensation

for their opportunity cost and risk of loss associated with such contribution and

commitment," Doc. 60 at 31, JA704, still could not have justified the Plan. As an

initial matter, the Commission concluded that the dividend provides the

shareholder exchanges with a reasonable rate of return without ever determining

what that rate of return would be and without ever seeking to quantify the risks the

---

[15] OCC, GOOD NEWS AND NEW OPPORTUNITIES: 2009 ANNUAL REPORT 30,
http://goo.gl/aEmQLn.

exchanges were incurring in exchange for that rate of return. Indeed, OCC appears

not to have provided the Commission with the studies or data upon which it relied

to conclude that the risks justified the reward.[16] The Commission simply took

OCC's word that OCC's outside financial advisor had looked into the matter, *id.* at

24 n.84, JA697, and accepted that

> the components of the Capital Plan—the Fee Policy, Refund Policy,
> and Dividend Policy—are designed to set the dividends to be paid to
> the Stockholder Exchanges at a level that the Board, with the
> assistance of independent outside financial experts, has determined to
> be reasonable for the cost and risks associated with the Stockholder
> Exchanges' contributed and committed capital.

*Id.* at 29, JA702. The Commission's conclusion, in other words, was based on

blind faith.

That faith was misplaced. To be sure, the absence of the underlying data

makes it difficult to conduct a complete analysis of OCC's conclusion that the

dividends offered "reasonable" compensation for the "cost and risks" assumed by

the shareholder exchanges. But had the Commission conducted even a rudimentary

analysis, it would have rejected OCC's conclusion. In return for a one-time capital

contribution of $150 million, the Shareholder Exchanges will receive in perpetuity

one half of the after-tax profits generated by clearing fees. Those fees will be set,

---

[16] If OCC did provide these studies or data to the Commission, the Commission did
not include those studies in the administrative record and made no mention of any
concrete data in its Approval Order.

moreover, to generate revenues expected to exceed annual expenses by 33%.[17]

OCC projected half-year operating expenses for 2015 of $117 million. Using the calculations set out in the Plan, twelve months of projected expenses of $234 million would be divided by .75 to arrive at the target clearing fee revenue level of $312 million. This would, in turn, result in projected annual income of $78 million ($312 million − $234 million), half of which, $39 million, would be pre-tax profits allocable to dividends. Assuming that no portion of this money was needed to maintain capital targets, therefore, in 2015 the shareholder exchanges should have received a return of between 17% and 26% on their investment of $150 million, depending on OCC's effective corporate tax rate.

Any suggestion that this princely return is justified because the five shareholder exchanges not only invested paid-in capital but also committed to providing replenishment capital equal to OCC's Baseline Capital Requirement ($117 million for 2015) does not survive even casual scrutiny. For even were the value of that conditional future capital commitment not discounted and treated as merely a "risk of loss," Doc. 60 at 31, JA704, but treated instead as paid-in capital today, the shareholder exchanges would still be receiving a return of between 9.5% and 14.6% (again depending on OCC's effective corporate tax rate).

---

[17] *See supra* p. 10.

When these potential rates of return are compared with actual market rates, the Commission's uncritical acceptance of OCC's glib assurance that the dividends are reasonable given the "risks associated with the Stockholder Exchanges' contributed and committed capital," Doc. 60 at 29, JA702, likewise cannot withstand even casual scrutiny. On December 29, 2014, when the Plan was filed with the Commission as an advance notice, high-yield sub-investment grade corporate debt was yielding, on average, only 6.67%.[18] The shareholder exchanges, of course, were not investing in junk bonds. To the contrary, OCC enjoys a very healthy AA+ rating from Standard & Poor's. On the date OCC filed the Plan with the Commission, AA rated debt was yielding, on average, 2.54%.[19] The Commission's assertion that a rate of return that could amount to 26% represents a reasonable compensation for the risk inherent in a AA+ rated, federally protected monopoly utility is simply untenable.

Furthermore, if the shareholder exchanges are, in fact, ever called upon to contribute even a dime of the replenishment capital they have committed, the Plan provides that all dividends and refunds will be suspended until the replenishment capital is repaid in full. And if it is not fully repaid within 24 months, refunds will

---

[18] *BofA Merrill Lynch US High Yield Effective Yield*, FEDERAL RESERVE BANK OF ST. LOUIS (last visited June 13, 2016), https://goo.gl/wHmDXS (mouse over Dec. 29, 2014).

[19] *BofA Merrill Lynch US Corporate AA Effective Yield*, FEDERAL RESERVE BANK OF ST. LOUIS, https://goo.gl/jvZJ0p (mouse over Dec. 29, 2014).

be suspended permanently, and dividends will resume in an amount equal to 100% of excess fees once the replenishment capital is repaid. For assuming the risk of providing a finite, clearly defined amount of replenishment capital, therefore, the five shareholder exchanges obtained, above and beyond their initial rate of return of as much as 26%, the right to receive *100%* of the 33% business risk buffer in dividends, potentially *doubling* their annual rate of return to *as much as 52%.*

The sweetheart deal offered the shareholder exchanges cannot possibly justify the Plan's obvious and significant burdens on competition.

### B.    The Plan Harms Investors and the Public Interest in Violation of Section 17A(b)(3)(F) of the Exchange Act.

Although Section 17A(b)(3)(F) of the Exchange Act requires that OCC's rules be "designed . . . to protect investors and the public interest." 15 U.S.C. § 78q-1(b)(3)(F), the Plan affirmatively harms investors and the public interest.

As just explained, the Plan harms investors and the public interest by unnecessarily burdening competition between the shareholder and non-shareholder exchanges. But this is just the beginning of the harms inflicted by the Plan.

Most fundamentally, the Plan transforms OCC from a public utility into a for-profit monopoly, sacrificing the interests of the investing public to those of the shareholder exchanges in numerous ways. As we have explained, OCC traditionally provided its services at cost, annually refunding all of its excess fees to the clearing members and, in turn, the investors who had paid them. Under the

33

Plan, however, clearing members and investors will receive at most half of these

excess fees, as half or more of these fees are used to build and maintain

shareholder equity and to pay dividends to the shareholder exchanges.

Furthermore, from the outset, the Plan permits OCC to retain $72 million in

excess 2014 fees, padding the shareholder exchanges' equity and reducing by

nearly one-third the amount of capital they would have otherwise been required to

pay in to meet OCC's new capital targets.

Nor is this use of excess fees paid by investors to benefit and protect the

shareholder exchanges a one-time event. Each year going forward, a portion of

fees not needed to meet operating expenses will be retained as needed to maintain

OCC's capital targets, thus protecting the shareholder exchanges who would

otherwise be required to provide replenishment capital for this purpose.

In addition, under the new for-profit business model, fully 50% of those fees

not needed to maintain capital targets and meet expenses will be used to pay

dividends to the shareholder exchanges. The net result is that clearing members

and the investing public will receive as refunds at most half of what they would

have received under OCC's traditional public-utility business model. Further, as

explained above, the Plan provides that refunds will be eliminated *permanently* if

replenishment capital is required and remains outstanding for two years—though

in that event *dividends* will not only resume once the replenishment capital has

34

been repaid but will *increase* as all fees not needed to pay operating costs and maintain capital targets will now be used to pay dividends.

In all of these ways, by sacrificing the interests of investors and clearing members to those of the shareholder exchanges, the Plan harms investors and the public interest in violation of Section 17A(b)(3)(F).

The Commission, however, rejected the argument "that the Dividend Policy, or the Capital Plan as a whole, changes OCC's essential role as a market utility," concluding instead that "the Capital Plan is designed to enhance OCC's capitalization rather than to enable the Stockholder Exchanges to monetize OCC's clearing monopoly." Doc. 60 at 28, JA701.

First, the Commission accepted OCC's representation that the dividends constituted "reasonable" compensation for the "cost and risks associated with the Stockholder Exchanges' contributed and committed capital." *Id*. at 29, JA702. We have refuted that argument above. *See supra* at I.A.

Second, the Commission stated that "[u]nder the Refund Policy, OCC will continue its practice of refunding a significant percentage of excess clearing fees to clearing members, thus preserving that aspect of OCC's industry 'utility' function." *Id*. at 28-29, JA701-02. But clearing members will receive at most half of what they would have before the Plan, and these refunds may ultimately be

35

eliminated entirely. That is a significant departure from OCC's traditional market utility model.

Finally, the Commission indicated that it did "not believe that the Capital Plan operates to increase fees, inflate operating expenses or drive up transaction costs in a manner inconsistent with the protection of investors or the public interest," *id*. at 29, JA702, and "[a]t the very least, [it did] not believe that it is inevitable that the Capital Plan will lead to higher fees as the commenters assert," *id*. at 30, JA703. But even if it were not *inevitable* that the Plan will lead to increased fees, it does not thereby follow that the Plan was affirmatively "*designed . . . to protect investors and the public interest*," as Section 17A(b)(3)(F) requires, but only that the Plan *might* not harm investors and the public interest *in this particular respect*. In all events, the Plan *will* inevitably lead to higher aggregate fees—at least in real terms—by dramatically reducing the portion of excess fees refunded to investors and clearing members.

The Commission credited OCC's claim that the Plan will reduce fees because it reduces the Target Capital Buffer—the percentage by which fees exceed expected operational expenses—from a historical average of 31% to 25%. Doc. 60 at 13, JA686. OCC, however, calculates this new "25%" capital buffer by dividing anticipated expenses by 0.75. Accordingly, the actual markup is 33.33% ($1 \div 0.75 = 1.333$)—an amount that exceeds 31%. Moreover, OCC's analysis disregards the

36

fact that under its historical public utility model, the entire amount by which fees exceeded operating costs was refunded to its customers, while under the Plan, at most half of this excess will be refunded. As a result, the Plan inevitably increases fees net of refunds from an amount equal to OCC's operating costs to an amount equal to those costs plus approximately 16.67% (half of the 33.33% buffer). (The exact markup will, of course vary depending on OCC's accuracy in projecting its operating expenses.)[20]

Even disregarding the effect of refunds on real aggregate fees, however, the Plan creates an inexorable incentive for the shareholder exchanges to increase or overestimate expenses, for increased estimated expenses lead to increased clearing fees, and increased clearing fees lead to increased dividend payments.

To commenters' concerns about these perverse incentives, the Commission accepted OCC's response "that higher operating expenses lead to a higher Target Capital Requirement, which would require additional capital contributions to be withheld from . . . [both] dividends and refunds." Doc. 60 at 22, JA695. But even

---

[20] The Commission also asserted that the Plan will benefit "customer end users who do not receive passed through refunds from the clearing member," Doc. 60 at 36, JA709, because, even if net fees paid are higher because of the reduction in refunds, the fees charged to these customers would be lower. The clearing members, however, are sophisticated entities operating in a fiercely competitive marketplace who necessarily incorporate their expected refunds into their original pricing decisions.

accounting for any fees retained to meet an increased Target Capital Requirement (only half of which would be otherwise available for dividends, as opposed to refunds, in all events), the shareholder exchanges could still see immediately enhanced dividend payments simply by overestimating projected operating expenses.[21]

What is more, once the increased Target Capital Requirement is met in year one, there will be no offset moving forward and the shareholder exchanges will receive higher dividends in every subsequent year as a result of increased operating

---

[21] For example, if OCC overestimates its expenses by 10%, it will increase its dividends by approximately 25%, even after some portion of excess fees are retained to increase the baseline capital requirement. This can be seen by imagining that OCC will incur operating costs of $100 million. If OCC accurately projects these operating costs, it will set fees to raise $133 million ($100 million ÷ 0.75), resulting in dividends to its shareholder exchanges of $16.67 million (disregarding corporate taxes and assuming that no fees need be withheld to maintain capital targets). If OCC instead projects operating costs of $110 million, it will set fees to raise $146.67 million ($110 million ÷ 0.75). Overestimating operating costs in this manner would increase the baseline capital requirement, which must equal at least six months' budgeted operating expenses. Doc. 60 at 9, JA682. Thus, in the hypothetical described here, the baseline capital requirement would increase from $50 million to $55 million, and OCC would be required to meet this requirement by retaining $5 million of excess fees. Assuming actual operating expenses were $100 million, however, the excess fees available for dividends and refunds would equal $41.67 million ($146.67 million −$5 million − $100 million), and the shareholder exchanges would receive half of this amount, $20.83 million, in dividends—$4.17 million, or 25%, more than the $16.67 million they would have received had OCC accurately projected expenses of $100 million.

expenses.[22] In sum, the need for additional capital to meet the increased capital

target does not present a meaningful deterrent to increasing operating costs—to the

contrary, it presents an investment opportunity for obtaining higher future

dividends.[23] And given the extraordinary rate of return available—and the fact that

half of the upfront capital cost will be borne by clearing members and investors

rather than the shareholder exchanges, in all events—the opportunity will be

difficult to resist.

Indeed, the Plan has already resulted in higher fees, even disregarding the

reduction in refunds. The Commission accepted at face value OCC's claim that it

had reduced its fees by 19% in 2016, thus demonstrating that the Plan would lead

to lower, as opposed to higher, fees. Doc. 60 at 29 n.108, JA702. This 19% fee

reduction, however, does not come close to offsetting the 70% *increase* in clearing

fees adopted by OCC in April 2014 when it began to develop the Plan.[24]

---

[22] In Year 2 (and beyond) under the scenario in the prior footnote, for example, dividends would increase to $23.34 million if estimated and actual operating expenses remained at $110 million and $100 million, respectively. ($146.67 million fees – $100 million expenses = $46.67 million, half of which is $23.34 million.) Even if actual expenses equaled estimated expenses of $110 million, dividends would increase to $18.34 million in year 2 and beyond. ($146.67 million – $110 million = $36.67 million.)

[23] It also increases the amount of equity the shareholder exchanges could monetize should they seek to sell all or part of their interests in OCC.

[24] *See* Doc. 5 at 3, JA055. *See also* Tom Polansek, *Options Clearing Corp raises fees, cites regulatory scrutiny*, REUTERS (Apr. 2, 2014), http://goo.gl/fVvIKm.

| OCC Clearing Fees | | | | |
|---|---|---|---|---|
| Fee amounts are per option contract unless otherwise noted | | | | |
| Option contracts per trade | 1-500 | 501-1000 | 1001-2000 | 2001+ |
| Pre-April 2014[25] | $.03 | $.024 | $18 per trade (equivalent to .018 to .009 per contract) | $18 per trade |
| April 2014- February 2016[26] | $.05 | $.04 | $.03 | $55 per trade |
| March 1, 2016[27] | $.041 | $.032 | $.024 | $55 per trade |

On May 1, 2016, moreover, OCC raised its fees once again, setting fees at $.041

per contract on trades comprising fewer than 1,371 contracts and at $55 per trade

on trades comprising 1,371 contracts or more.[28] As a result, a market participant

who would have paid $18.00 in clearing fees for a single trade of 1,371 contracts in

2013—with a refund of 100% of any portion of these fees not needed to pay

OCC's operating costs—must now pay $55 in fees for the exact same trade, with a

potential refund of at most half of that excess.

---

[25] *OCC Schedule of Fees / January 2013*, OCC, http://goo.gl/kfZQyu.

[26] *OCC Schedule of Fees / April 2014*, OCC, http://goo.gl/JMcyMn.

[27] *OCC Schedule of Fees / March 2016*, OCC, http://goo.gl/rlwraF.

[28] *OCC Schedule of Fees / May 2016*, OCC (last visited June 15, 2016), http://goo.gl/YR3hQa.

**C.     The Plan Allocates Unreasonable Clearing Fees in an Inequitable and Discriminatory Manner in Violation of Sections 17A(B)(3)(D) and 17A(B)(3)(F) of the Exchange Act.**

Section 17A(b)(3)(D) of the Exchange Act requires that OCC's rules "provide for the equitable allocation of reasonable dues, fees, and other charges among its participants." 15 U.S.C. § 78q-1(b)(3)(D). Section 17A(b)(3)(F), in turn, prohibits OCC from adopting rules "designed to permit unfair discrimination . . . among participants in the use of the clearing agency." 15 U.S.C. § 78q-1(b)(3)(F). The Plan violates these provisions in numerous ways.

First, the Plan inequitably allocates fees and unfairly discriminates against non-shareholder exchanges and other participants by denying them the opportunity to reap any of the extraordinary benefits granted the shareholder exchanges.

Second, the Plan inequitably allocates fees and unfairly discriminates between the shareholder exchanges and the clearing members and investors who pay fees and use the exchanges in several ways.

i. OCC met its initial targets under the Plan in two ways: (1) by retaining $72 million in excess clearing fees that would have otherwise been refunded to clearing members and investors, and (2) by receiving $150 million from the shareholder exchanges. *See supra* at I.B; Doc. 22 at 8, JA146. While the shareholder exchanges received the right to princely dividends in exchange for their investment, the clearing members and investors received nothing whatsoever

41

in return for their capital contribution—instead, they saw their future refunds

slashed by at least 50%. Retaining the $72 million in excess fees also granted the

shareholder exchanges an extraordinary windfall on their actual paid-in equity. At

the time the Plan was decided upon, the shareholder exchanges had paid in less

than $3 million, and OCC's total capitalization amounted to only $25 million. By

converting $72 million of excess fees into capital, OCC immediately increased its

shareholders' equity interest by 300% and granted the shareholder exchanges an

immediate 2400% return on their actual, to date capital investment. Although

commenters raised these issues with the Commission, Doc. 5 at 5, JA057, the

Commission did not even address—let alone justify—this inequitable and

discriminatory treatment.

ii. OCC will maintain its capital targets going forward primarily by retaining

fees that would otherwise be refunded to clearing members and investors, drawing

on the shareholders for the replenishment capital they have committed only if the

targets cannot be maintained by retaining fees. *See supra* at I.A. While the Plan

carefully provides for repayment of any replenishment capital—even at the

expense of refunds and dividends—clearing members and investors again receive

nothing for their capital contribution. The Commission again offered no response

to this inequitable and discriminatory treatment. Doc. 3 at 4, JA046.

42

iii. Refunds to clearing members and dividends to shareholders are treated differently if replenishment capital remains outstanding for more than 24 months— refunds are cut off forever, while dividends will resume at an increased rate as 100% of fees not needed to pay expenses and maintain capital requirements will be used to pay dividends once the replenishment capital has been repaid. Not only did the Commission disregard comments raising this inequitable and discriminatory feature of the Plan, it erroneously asserted that *both* dividends and refunds would be eliminated should replenishment capital ever remain outstanding for twenty-four months. *Compare* Doc. 60 at 16, JA689, *with* Doc. 22 at 14, JA152, *and* Doc. 7 at 6, JA077.

### D.    The Plan Was Formulated in Violation of OCC's Bylaws and Section 19(g)(1) of the Exchange Act.

Under Section 3(a)(26) of the Exchange Act, OCC is a "self-regulatory organization." 15 U.S.C. § 78c(a)(26). Section 19(g)(1) of the Act requires that "[e]very self-regulatory organization shall comply with . . . *its own rules*." 15 U.S.C. § 78s(g)(1) (emphasis added). In developing and deciding upon the Plan, OCC failed to comply with its own bylaws.[29] The proposal and approval of the Plan thus violated Section 19(g)(1).

---

[29] The Exchange Act defines "clearing agency rules" to include bylaws. 15 U.S.C. § 78c(a)(27).

43

OCC's bylaws require that non-shareholder exchanges "be promptly provided with information that the Executive Chairman considers to be of competitive significance to such Non-Equity Exchanges . . . ." OCC Bylaws, Art. VIIB, § 1.01, *available at* http://goo.gl/EbDCd4. Relatedly, OCC's bylaws require that non-shareholder exchanges "be afforded the opportunity to make presentations to the Board of Directors or an appropriate Committee of the Board of Directors" regarding matters that affect their interests. *Id.* at Art. VIIB, § 1.02.

OCC acknowledges that "the Board and Management engaged in a nearly year-long process during which they analyzed a wide range of alternative methods to increase OCC's capital to a level considered to be sufficient. . . ." Doc. 7 at 4, JA075. And although OCC argues now that "none of the non-stockholder exchanges have presented a proposal under which they would provide a meaningful source of additional equity capital to for OCC," *id.* at 3, JA074, at no point during its extended deliberative process did OCC provide the non-shareholder exchanges any opportunity for doing so. Doc. 18 at 2, JA134. Indeed, OCC concedes that it did not even provide the non-shareholder exchanges notice that these deliberations were taking place, let alone notice of the proposed changes ultimately made part of the Plan. Doc. 33 at 16, JA321. OCC's failures to provide the non-shareholder exchanges either notice or any opportunity to present their views constitute blatant violations of OCC's bylaws and Section 19(g)(1).

44

Although these violations were brought to its attention, Doc. 18 at 2, JA134, the Commission uncritically accepted OCC's "represent[ation]" that it had "work[ed] through its internal governance process and obtain[ed] its Board's approval of the Capital Plan in accordance with its By-Laws prior to filing the proposed rule change" and dismissed the various commenters' challenges to these representations as "separate questions" raising "corporate governance principles" that "are not appropriately addressed by the Commission in the context of reviewing this rule filing." Doc. 60 at 45-46, JA718-19. The Commission's refusal to look behind OCC's representations is utterly irreconcilable with its obligation to ensure that OCC's rule changes comply with the Exchange Act, *see* Exchange Act, § 19(b)(2)(C), 15 U.S.C. § 78s(b)(2)(C)(i), including the requirement that OCC "comply with . . . its own rules," Exchange Act, § 19(g)(1), 15 U.S.C. § 78s(g)(1).

OCC defends its decision to cut the non-shareholder exchanges out of its deliberations on the ground that "there were no *material* competitive consequences resulting from the Capital Plan that would have triggered prior notice to or an opportunity for the Non-Stockholder Exchanges to make presentations." Doc. 60 at 44-45, JA717-18 (emphasis added). This is so, OCC maintains, because "the Capital Plan does not alter the manner in which Non-Stockholder Exchanges receive clearing services," *id*. at 45, and because (it asserts) the Stockholder

45

Exchanges agreed to the Plan "reluctantly and only after other alternatives were found inadequate," Doc. 33 at 16, JA321.

But the requirements of Article VIIB, § 1.01 are triggered when the Executive Chairman of OCC's Board finds a *proposed* change to be of "competitive significance," not by an *ex post* analysis of whether a course of action already decided upon will have "*material* competitive consequence" for non-shareholder exchanges. The very fact that OCC was considering ways to increase its shareholders' equity was itself a matter of competitive significance and was so *at the time of the deliberations.* Even on its own terms, OCC's attempt to justify shutting the non-shareholder exchanges out of these deliberations on the ground that the plan ultimately decided upon did not have any "material competitive consequence" turns the notice and presentation provisions on their head. These provisions are intended to permit the non-shareholder exchanges to contribute to the decision-making process; they are rendered meaningless if the decision whether to notify the non-shareholder exchanges and permit them to present their views is made only "after other alternatives [are] found inadequate," Doc. 33 at 16, JA321, and the final decision is already made.

In all events, neither the fact that OCC still provides the same clearing services to the non-shareholder exchanges nor the shareholder exchanges' alleged "reluctance" in agreeing to the Plan speaks to—let alone negates—the obvious

46

competitive significance of transforming OCC from a public utility, in which

profits are refunded to clearing members and investors on a *pro rata* basis, to a

profit-generating monopoly in which half of OCC's profits—including those

profits generated by trades on the non-shareholder exchanges—are used to pay

dividends to the shareholder exchanges alone. It is difficult to imagine a corporate

action of greater competitive significance to the non-shareholder exchanges that

must now compete with the five shareholder exchanges on such unequal footing.

OCC's claim that it did not believe this change had any material competitive

consequence is simply untenable.

Indeed, OCC's decision to disregard Articles VIIB.01 and VIIB.02 triggered

precisely the type of anti-competitive harm that those Articles were enacted to

prevent. Both articles were adopted by OCC in 2002 when it was seeking SEC

approval of its decision to bar new exchanges from becoming shareholders. In

approving this decision despite the obvious potential anti-competitive implications

of shutting out emerging exchanges, the Commission emphasized the importance

of these bylaws:

> [The fact that] OCC's management will provide non-equity exchanges
> with the opportunity to make presentations to the OCC board and will
> promptly pass on to non-equity exchanges any information disclosed at
> or in connection with OCC board meetings that management considers
> to be of competitive significance should help to ensure that no burden
> on competition that is not necessary or appropriate in furtherance of the
> Act will occur.

Securities and Exchange Act, Release No. 34-46469, File No. SR-OCC-2002-02 (Sept. 6, 2002), 67 Fed. Reg. 58095 (Sept. 13, 2002).

## II. OCC's Proposal Was Substantively and Procedurally Flawed.[30]

### A. OCC Proposed a Substantively Unreasonable Plan.

As demonstrated above, *see* Part I.A-C, the Plan is anticompetitive, sacrifices the interests of the public and investors to OCC's shareholders, and unfairly and unreasonably discriminates against the non-shareholder exchanges, the clearing members, and investors. Even if these features of the plan did not violate the Exchange Act, they are arbitrary, capricious, and an abuse of discretion.

### B. OCC Violated Its Own Procedural Rules.

OCC's failure to follow its own bylaws, *see* Part I.D, was arbitrary, capricious, and an abuse of discretion. It is well settled that agencies must "follow their own rules, even gratuitous procedural rules that limit otherwise discretionary actions." *Steenholdt v. FAA*, 314 F.3d 633, 639 (D.C. Cir. 2003). This violation was particularly egregious given that those procedural rules were adopted to prevent the very type of injury the Plan inflicts.

---

[30] For convenience and clarity, this section of the argument focuses on the substantive flaws in the Plan proposed by OCC and the shortcomings of OCC's decisionmaking process. Regardless of whether the APA applies of its own force to OCC, the Commission's failure to remedy these substantive and procedural flaws was arbitrary, capricious, and an abuse of discretion.

48

## C.    OCC Failed to Engage in Reasoned Decisionmaking.

OCC never provided the non-shareholder exchanges, clearing members, or market participants access to the studies and data upon which it purports to have relied in devising and justifying the Plan. "It is a small matter to abide by the injunction of the arithmetic teacher: Show your work!" *City of Holyoke Gas & Elec. Dept. v. FERC*, 954 F.2d 740, 743 (D.C. Cir. 1992). OCC failed to do so here.

OCC reports that it "engaged an outside consulting firm to develop capital needs and targets and a financial advisor to provide analysis on dividend returns." Doc. 60 at 24 n.84, JA697. OCC claims to have relied on these outside advisors in concluding that the "the potential rate of return to Stockholder Exchanges was reasonable in light of the nature of the capital commitments and the additional risks inherent in their contributions." *Id.* at 24, JA697. Its claims that the burdens that the Plan places on competition are necessary or appropriate, and that the dividends promised the shareholder exchanges are "reasonable," rest on the analysis that these consultants performed.

This analysis was never subjected to stakeholder scrutiny while the Plan was under consideration. "It would appear to be a fairly obvious proposition that studies upon which an agency relies in promulgating a rule must be made available during the rulemaking in order to afford interested persons meaningful notice and

49

an opportunity for comment." *American Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 237 (D.C. Cir. 2008). OCC thus denied the public, the non-shareholder exchanges, and other stakeholders of the ability to assess and to comment on the legality and desirability of the Plan.

Nor did OCC subsequently reveal—not to the public or, it would seem, even to the SEC—the analysis and underlying data upon which it relied. An "agency must make clear the basic data and the *whys* and *wherefores* of its conclusions." *Puerto Rico Mar. Shipping Auth. v. Federal Mar. Comm'n*, 678 F.2d 327, 336 (D.C. Cir. 1982) (emphasis added) (quotation marks omitted). "It is not consonant with the purpose of a rule-making proceeding to promulgate rules on the basis of inadequate data, or on data that, [to a] critical degree, is known only to the agency." *Portland Cement Ass'n v. Ruckelshaus*, 486 F.2d 375, 393 (D.C. Cir. 1973), *superseded by statute*, 175 F.3d 1027, 1042 (D.C. Cir. 1999).

## III.  The Commission's Decision to Approve the Plan Was Arbitrary, Capricious, and an Abuse of Discretion.

### A.  The Commission Failed to Engage in Reasoned Decisionmaking.

"An agency action must be supported by 'reasoned decisionmaking,' whether taken in the course of rulemaking or adjudication." *United States Postal Serv. v. Postal Regulatory Comm'n*, 785 F.3d 740, 744 (D.C. Cir. 2015) (citing *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998)). The basis for any agency action "must be set forth with such clarity as to be understandable."

50

*SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947). The Court will "not defer to the agency's conclusory or unsupported suppositions." *NetCoalition v. SEC*, 615 F.3d 525, 539 (D.C. Cir. 2010), *superseded by statute*, 715 F.3d 342 (2013).

### 1.  The Commission Accepted Unreasonable Assurances that Were Unsupported by the Administrative Record.

As noted above, OCC appears not to have provided the Commission with the analysis and data upon which it relied when formulating the Plan. If so, the Commission could not have meaningfully evaluated OCC's proposal, and its Approval Order must necessarily be set aside as arbitrary and capricious. *See Portland Cement Ass'n*, 486 F.2d at 393. Even if the Commission did have access to this analysis and data, moreover, it did not include them in the administrative record or discuss them in its Approval Order. This alone warrants remand to the agency. *Solite Corp. v. EPA*, 952 F.2d 473, 499-500 (D.C. Cir. 1991). For "[t]o allow an agency to play hunt the peanut with technical information, hiding or disguising the information that it employs, is to condone a practice in which the agency treats what should be a genuine interchange as mere bureaucratic sport." *Connecticut Light & Power Co. v. NRC*, 673 F.2d 525, 530 (D.C. Cir. 1982).

The inadequate record hindered commenters' ability to address key elements of the Plan before the Commission. For example, commenters could not determine what rate of return OCC believed its shareholders would receive on their

investment, or on what basis it believed that rate of return was reasonable. Doc. 60 at 23 n.79, JA696.

Likewise, commenters could not discern how OCC had calculated either its new target risk buffer or its purported average historical risk buffer, Doc. 5 at 7-8, JA059-60, a matter of importance given OCC's claim that the Plan will significantly reduce clearing fees by reducing the risk buffer from a historical average of 31% to a fixed target of 25%. Doc. 60 at 13, JA686. Commenters observed that, based upon the description of how the buffer is calculated in the record ("divid[ing] the expense forecast by .75"), "the Plan would actually create a 33% buffer instead of a 25% buffer." Doc. 5 at 7-8, JA059-60. OCC responded only that the risk buffers have always been calculated this way. Doc. 8 at 13, JA092. OCC provided no historical data or analysis to support either its bald—and, frankly, counter-intuitive—assertion that 33 has always constituted 25% of 100, or even its empirical claim that OCC's risk buffer has historically been 31% (or, rather 44.9%—*i.e.*, projected expenses ÷ .69). Despite reviewing the publicly available data themselves, Petitioners have failed to identify any set of revenue and refund figures that would support OCC's claims.

Rather than requiring or scrutinizing the data and analysis upon which OCC purported to rely, the Commission simply accepted on faith OCC's assurances that its Plan was reasoned, adequately supported, and in accordance with law. For

example, instead of independently determining whether the Target Capital Requirement was reasonable in light of OCC's regulatory requirements, the Commission accepted at face value OCC's conclusory assertion that it "used various measures and took a methodical and reasoned approach to establish the Target Capital Requirement." Doc. 60 at 32, JA705. Likewise, after acknowledging commenters' concern "that the true amount [of the return the shareholder exchanges will receive] is not known to them," the Commission never bothered to ascertain for itself even what the "true amount" would be, let alone whether this amount was appropriate. *Id.* at 23 n.79, JA696. Instead, the Commission simply accepted OCC's assurance that the rate of return would be reasonable. *Id.* at 24, JA697. The Commission even disregarded specific claims by the non-shareholder exchanges that OCC had violated its bylaws by not providing them with the notice because OCC "represented" that it had "completed all action required to be taken under its constitution, articles of incorporation, bylaws, rules or corresponding instruments . . . working through its internal governance process and obtaining its Board's approval of the Capital Plan in accordance with its By-laws prior to filing the proposed rule change." *Id.* at 45, JA718. In short, the Commission nowhere demanded of OCC: "Show your work!" *City of Holyoke Gas & Elec. Dep't*, 954 F.2d at 743. Rather, it simply accepted OCC's proposal as reasonable and lawful because OCC, purportedly "with the assistance of

53

independent outside financial experts" and "outside counsel," had decided that it was. Doc. 60 at 24 n.84, 29, JA697, JA702. This is not the reasoned decisionmaking required by the APA.

### 2.    The Commission Misunderstood a Key Feature of the Plan.

The Plan provides that although refunds will be permanently eliminated if replenishment capital ever remains outstanding for more than twenty-four months, dividends will resume if the replenishment capital is subsequently repaid. *See supra* at III.A. The Commission nevertheless erroneously stated that dividends and refunds would be treated identically in these circumstances. *See* Doc. 60 at 16, JA689. The Commission could not have conducted a reasoned analysis of a plan that it failed to understand.

### 3.    The Commission Overlooked or Ignored Central Elements of the Plan and Key Facts.

The Commission ignored or overlooked irrational and unlawful components of the Plan. For example, the Commission simply did not address the Plan's disparate treatment of either the retained excess fees and paid-in capital used to meet OCC's capital targets in the first instance, or of the retained excess fees and replenishment capital that might be used to maintain capital targets going forward. *See supra* at I.B.

The Commission also overlooked or ignored key facts. For example, the Commission found that the Plan will allow for "generally lower fees." *Id.* at 29,

JA702. In support of this finding, the Commission cited OCC's announcement that it would reduce its fees by 19% in 2016. *Id.* at 14 n.46, JA687. The Commission failed to mention, however, that OCC had raised fees by 70% in 2014 at the outset of its deliberations that ultimately culminated in the Plan. Doc. 5 at 3, JA055; Doc. 11 at 3, JA114. Even after the short-lived 19% fee reduction that went into effect on March 1, 2016, therefore, the Plan still *increased* clearing fees by 38% from what they had been just two years before.

### B.    The Commission Failed to Consider Reasonable Alternatives.

The commenters presented the Commission with reasonable alternatives to the Plan that would have adequately capitalized OCC, preserved OCC's utility status, and promoted (or at least not hampered) competition. These included "raising capital from its clearing members, offering non-equity owner exchanges the opportunity to become stockholders and participate on a level playing field with respect to the receipt of dividends, or raising capital from other third party investors." Doc. 3 at 3, JA045. This Court has long held that "where a party raises facially reasonable alternatives . . . the agency must either consider those alternatives or give some reason . . . for declining to do so." *Laclede Gas Co. v. FERC*, 873 F.2d 1494, 1498 (D.C. Cir. 1989). The Commission nevertheless summarily dismissed some of the commenters' alternatives and failed to consider others. This failure to afford adequate—indeed any—consideration to reasonable

55

alternatives warrants vacating the Approval Order. *See Chamber of Commerce v. SEC*, 412 F.3d 133, 144 (D.C. Cir. 2005).

The Commission rejected the possibility of raising capital by retaining earnings, for example, on the ground that so doing would have involved "costs related to applicable taxes as well as additional time to accumulate sufficient capital, during which time OCC will be exposed to business, operational and pension risks without sufficient capital to protect itself." Doc. 60 at 41, JA714. The tax consequences to which the Commission refers are, of course, the same tax consequences to which OCC will now be exposed, in perpetuity, on account of its new dividend policy. And as discussed above, *see supra* at I.A, even accepting the Commission's dubious premium on speed, the ample excess fees available from 2014 and 2015 alone make clear that any concerns about the supposed slowness of this alternative were unfounded. In all events, any concern that retaining excess fees might fail to generate capital quickly enough to respond to an emergency overlooks the obvious fact that, if the shareholder exchanges were willing to provide $150 million in immediate capital *and also* $117 million in replenishment capital in the event of a crisis, they could easily have been asked to commit to provide *only* replenishment capital. This would have bought OCC time to meet its capital targets in a way that did not rely or confer benefits exclusively on the shareholder exchanges.

56

Second, the Commission did not explain why OCC could not have met its capital targets by including a sunset provision, under which dividends would be paid to the shareholder exchanges only until their $150 million capital contribution, along with a reasonable rate of return, had been repaid. Doc. 4 at 4, JA051. This provision would not have harmed competition. It would not have altered the ownership structure or public utility status of OCC. And it would have permitted OCC to meet its capital requirements.

Third, the Commission offered no reasonable explanation for dismissing the alternative of raising capital by permitting the non-shareholder exchanges, clearing members, and/or other market participants to become equity owners of OCC. This alternative would have preserved or even promoted competition, as the Exchange Act requires, and would also have given OCC a broader ownership base to which it could turn to meet any future capital needs. The only justification offered by the Commission for dismissing this alternative was that it "would have necessitated governance changes over a period of time." Doc. 60 at 40, JA713. But the Plan itself required that OCC amend its bylaws, its certificate of incorporation, and its stockholders agreement. *Id.* at 8 n.33, JA681. These changes are no different in kind from what this alternative would have required.

Finally, the Commission did not explain why OCC could not raise capital simply by turning to the capital markets. Capital could have been raised through a

public stock offering of additional, non-voting class B stock, by creating a new class of shares, or by issuing a class of non-cumulative redeemable preferred stock, Doc. 4 at 4, JA051. The last alternative was one that OCC had itself deemed the best approach to raising capital in 2014.[31] Turning to the capital markets would have avoided the "substantial likelihood that the Stockholder Exchanges are receiving both preferred terms and above-market returns for their contributions of equity." Doc. 6 at 4, JA070. That the federal agency charged with regulating the capital markets failed to consider the alternative of raising capital through those markets is simply baffling.

### C.    The Commission Failed to Address Significant Comments.

The Commission's decision must also be set aside because the Commission failed to respond to numerous "relevant" and "significant" public comments. *Home Box Office, Inc. v. FCC*, 567 F.2d 9, 35 n.58 (D.C. Cir. 1977). Once a comment is "significant enough to step over a threshold requirement of materiality," the "lack of agency response or consideration becomes of concern." *Portland Cement Ass'n*, 486 F.2d at 394.

---

[31] *See* Letter from James E. Brown, General Counsel, The Options Clearing Corporation to Kevin O'Neill, Deputy Secretary, SEC at 12-14 (May 27, 2014), http://goo.gl/8k233c.

First, because the SEC mischaracterized the Plan as permanently suspending both refunds and dividends whenever replenishment capital remains outstanding for twenty-four months, *see supra* at III.A.2, the Commission never considered, nor did it respond to, the numerous comments protesting this patently inequitable feature of the Plan.

Second, the Commission did not respond to comments objecting to the disparate treatment afforded the $72 million raised by retaining excess 2014 fees, on the one hand, and the $150 million paid in by the shareholder exchanges, on the other hand. *See supra* at I.B. Nor did it address concerns raised regarding the inequitable treatment of future retained excess fees versus replenishment capital. *See supra* at I.B.

Finally, as noted in Section III.A.1, the Commission never responded to commenters who observed that OCC's claim that the Plan would reduce clearing fees by lowering OCC's risk buffer from a historical average of 31% to a target of 25% rested on the dubious assumption that 33 equals 25% of 100. *See* Doc. 5 at 7-8, JA059-60.

## D. The Commission's Refusal to Require OCC to Comply with Its Own Bylaws Was Arbitrary and Capricious.

As noted above, *see supra* at I.D, the Commission acted contrary to law when it refused not only to require OCC to follow the procedures set forth in its bylaws, but even to consider whether OCC had done so. The Commission's refusal

to do so—especially where the violation of these bylaws produced precisely the type of harm they were adopted to prevent—was arbitrary, capricious, and an abuse of discretion.

## CONCLUSION

For the foregoing reasons, the Petition for Review should be granted, the Commission's order vacated, and the matter remanded to the agency.

DATED: October 14, 2016                    Respectfully submitted,

/s/ David H. Thompson
David H. Thompson
Howard C. Nielson, Jr.
Peter A. Patterson
Harold S. Reeves
COOPER & KIRK, PLLC
1523 New Hampshire Ave., N.W.
Washington, D.C.  20036
(202) 220-9600

*Counsel for Petitioners*

# CERTIFICATE OF COMPLIANCE

Pursuant to FED. R. APP. P. 32(a)(7)(C), I certify the following:

This brief complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure because this brief contains 13,795 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii) of the Federal Rules of Appellate Procedure and Circuit Rule 32(a)(1).

This brief complies with the typeface requirements of Rule 32(a)(5) of the Federal Rules of Appellate Procedure and the type style requirements of Rule 32(a)(6) of the Federal Rules of Appellate Procedure because this brief has been prepared in a proportionately spaced typeface using the 2016 version of Microsoft Word in 14-point Times New Roman font.

/s/ David H. Thompson
David H. Thompson

61

# STATUTORY ADDENDUM

## TABLE OF CONTENTS

15 U.S.C. § 78c(a)................................................................................63

15 U.S.C. § 78c(f)................................................................................63

15 U.S.C. § 78q-1(b)(3)(D)...................................................................63

15 U.S.C. § 78q-1(b)(3)(F)...................................................................64

15 U.S.C. § 78q-1(b)(3)(I)....................................................................64

15 U.S.C. § 78s(g)(1)...........................................................................64

**15 U.S.C. § 78c(a)**

(a) Definitions

When used in this chapter, unless the context otherwise requires—

\* \* \*

(26) The term "self-regulatory organization" means any national securities exchange, registered securities association, or registered clearing agency, or (solely for purposes of sections 78s(b), 78s(c), and 78w(b) of this title) the Municipal Securities Rulemaking Board established by section 78o-4 of this title.

(27) The term "rules of an exchange", "rules of an association", or "rules of a clearing agency" means the constitution, articles of incorporation, bylaws, and rules, or instruments corresponding to the foregoing, of an exchange, association of brokers and dealers, or clearing agency, respectively, and such of the stated policies, practices, and interpretations of such exchange, association, or clearing agency as the Commission, by rule, may determine to be necessary or appropriate in the public interest or for the protection of investors to be deemed to be rules of such exchange, association, or clearing agency.

**15 U.S.C. § 78c(f)**

(f) Whenever pursuant to this chapter the Commission is engaged in rulemaking, or in the review of a rule of a self-regulatory organization, and is required to consider or determine whether an action is necessary or appropriate in the public interest, the Commission shall also consider, in addition to the protection of investors, whether the action will promote efficiency, competition, and capital formation.

**15 U.S.C. § 78q-1(b)(3)(D)**

(3) A clearing agency shall not be registered unless the Commission determines that--

\* \* \*

(D) The rules of the clearing agency provide for the equitable allocation of reasonable dues, fees, and other charges among its participants.

## 15 U.S.C. § 78q-1(b)(3)(F)

(3) A clearing agency shall not be registered unless the Commission determines that--

\* \* \*

(F) The rules of the clearing agency are designed to promote the prompt and accurate clearance and settlement of securities transactions and, to the extent applicable, derivative agreements, contracts, and transactions, to assure the safeguarding of securities and funds which are in the custody or control of the clearing agency or for which it is responsible, to foster cooperation and coordination with persons engaged in the clearance and settlement of securities transactions, to remove impediments to and perfect the mechanism of a national system for the prompt and accurate clearance and settlement of securities transactions, and, in general, to protect investors and the public interest; and are not designed to permit unfair discrimination in the admission of participants or among participants in the use of the clearing agency, or to regulate by virtue of any authority conferred by this chapter matters not related to the purposes of this section or the administration of the clearing agency.

## 15 U.S.C. § 78q-1(b)(3)(I)

(3) A clearing agency shall not be registered unless the Commission determines that--

\* \* \*

(I) The rules of the clearing agency do not impose any burden on competition not necessary or appropriate in furtherance of the purposes of this chapter.

## 15 U.S.C. § 78s(g)(1)

(g) Compliance with rules and regulations

(1) Every self-regulatory organization shall comply with the provisions of this chapter, the rules and regulations thereunder, and its own rules, and (subject to the provisions of section 78q(d) of this title, paragraph (2) of this subsection, and the rules thereunder) absent reasonable justification or excuse enforce compliance--

\*\*\*

(C) in the case of a registered clearing agency, with its own rules by its participants.

## CERTIFICATE OF SERVICE

I hereby certify that on this 14th day of October, 2016, I filed the foregoing

Final Brief of Petitioners Susquehanna International Group, LLP, KCG Holdings,

Inc., Bats Global Markets, Inc., Miami International Securities Exchange, LLC,

and BOX Options Exchange LLC, with the Clerk of the Court using the CM/ECF

System, which will send notice of such filing to the following registered users:

Emily True Parise Rosen
Securities and Exchange Commission
Office of the General Counsel
100 F Street, NE
Washington, DC 20549

Michael Andrew Conley
Securities and Exchange Commission
100 F Street, NE
Washington, DC 20549-9040

Tracey Anne Hardin
Securities and Exchange Commission
Room 8214
100 F Street, NE
Washington, DC 20549-9040

*Counsel for SEC*

William J. Nissen
Sidley Austin LLP
One South Dearborn Street
Chicago, IL 60603

*Counsel for OCC*

I further certify that I caused a copy of the foregoing to be sent via UPS to

pro se movant-amici curiae in support of petitioners at the following address:

Robert Battalio
Professor of Finance
Mendoza College of Business
241 Mendoza College of Business
Notre Dame, IN 46556

Robert Jennings
Professor of Finance (Emeritus)
Kelly School of Business
Indiana University
1309 E. 10th Street
Room HH6100
Bloomington, IN 47405


/s/ David H. Thompson
David H. Thompson